## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| PATRICIA GROSSBERG LIVING TRUST, individually and on behalf of all other similarly situated stockholders, | : : : : | Case No. 11-cv-1982 (AKH) |
| Plaintiff, | : : |  |
| -v.- | : |  |
| BANK OF AMERICA CORPORATION, BRIAN T. MOYNIHAN, CHARLES H. NOSKI, KENNETH D. LEWIS, JOSEPH L. PRICE, and COUNTRYWIDE FINANCIAL CORPORATION, | : : : : : : | |
| Defendants. | : : : : |  |



## **AMENDED COMPLAINT**

Plaintiff Patricia Grossberg Living Trust ("Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Bank of America Corporation ("BAC" or the "Company"), between July 23, 2009 and October 19, 2010, inclusive (the "Class Period"), by their undersigned attorneys, bring this action alleging fraud and violations of Sections 10(b), 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against BAC, for itself and as successor-in-interest to Countrywide Financial Corporation ("Countrywide"), Brian T. Moynihan, Charles H. Noski, Kenneth D. Lewis, and Joseph L. Price (collectively, "Defendants").   The allegations against Defendants are based on personal knowledge as to Plaintiff's own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of counsel, which included, among other things, a review of public statements, press releases, and SEC filings by Defendants; analyst and financial press reports; and other data and sources set forth below.  Plaintiff further believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF CLAIMS

1.     This is a securities fraud class action brought on behalf of all persons and entities who purchased or otherwise acquired BAC securities during the Class Period, based upon claims under the Exchange Act, 15 U.S.C. §§78j(b) 78t-1, 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

2.     This action alleges that Defendants concealed material information and made false and misleading statements related to: (a) BAC's financial exposure to faulty mortgages that had been originated by Countrywide, and (b) BAC's mortgage servicing operations, in order to artificially inflate the price of BAC securities during the Class Period.

3.      On July 1, 2008, BAC acquired Countrywide.  Overnight, this transformed BAC from a nascent player in the mortgage business to one of the largest mortgage lenders in the United States.

4.      After acquiring Countrywide, Defendants discovered serious deficiencies in Countrywide's origination and servicing practices.  Specifically, BAC learned that, because of numerous instances of faulty underwriting by Countrywide when originating mortgage loans, BAC faced exposure to tens of billions of dollars of repurchase demands from investors who had purchased these loans from Countrywide.  Compounding this exposure, BAC learned of numerous deficiencies in Countrywide loan servicing procedures, including lost or misplaced documents, predatory lending and servicing practices, and improper foreclosures.  Rather than attempt to fix these issues or disclose them to investors, Defendants chose to cover them up.

5.      Specifically, throughout the Class Period, Defendants repeatedly assured investors that BAC's exposure to repurchase demand was manageable, and that BAC had adequately reserved for this exposure.  On numerous occasions, Defendants claimed that repurchase demands were unjustified, and would be contested by BAC.

6.      Furthermore, Defendants made numerous false and misleading statements about the Company's commitment to being a "leader in responsible home lending practices" and claimed that the Countrywide acquisition actually ***"significantly improved"*** BAC's origination and servicing practices.  In fact, Defendants engaged in a scheme to do just the opposite.  As home foreclosures rose, Defendants compensated for their lack of proper documentation (which inhibited their ability to foreclose properties) by employing low-level automatons or "robo-signers" to rubberstamp affidavits certifying that BAC owned the properties in question.

7.      Because the stock prices of financial firms suffered so much during the recession, Defendants were terrified that if further bad news emerged that BAC's stock price might collapse and that their jobs could be in jeopardy.  Thus, Defendants concealed the truth from the market for as long as they could.

8.      In September 2010, however, reports began to surface about mortgage lenders' predatory servicing practices and, in particular, the use of "robo-signers" to fraudulently push through foreclosures on the banks' behalf.  By October 2010, the hue and cry over this reached a fever pitch as banks, including BAC, suspended foreclosures and state and federal government entities opened investigations into bank lending and servicing practices.

9.      Defendants initially downplayed the foreclosure suspension as a move to merely "clear the air."  However, the bad news kept coming.  On October 13, 2010, the Attorneys Generals of all 50 states opened investigations into bank lending and servicing practices.  Shortly thereafter, investors who had purchased bad mortgages from BAC demanded (as was their right under the representations and warranties in the loan purchase agreements) that BAC buy back billions in faulty mortgage loans.  On October 19, 2010, the market learned the truth as BAC disclosed for the first time that there were, in fact, issues with its mortgage lending and servicing practices.

10.     Also, on October 14, 2010, Branch Hill Capital issued a report analyzing BAC's liability for repurchase claims, causing BAC's stock price to drop 4.92%.  On October 18, 2010, a group of investors made *$47 billion* in buyback demands related to mortgage-backed securities sold by BAC, causing the Company's stock to drop another 4.38%.

11.     As a result of Defendants' false and misleading statements, the Company's stock price reached an artificial high of over $38 per share.  By the time the truth was revealed, the

Company's stock price collapsed to just over $11 per share, wiping out over **$15 billion** in market capital in a matter of days.

## PARTIES

### A.   THE PLAINTIFF

12.     Plaintiff Patricia Grossberg Living Trust is a trust located at 3141 N. 36th Street, Hollywood, FL 33021.  Plaintiff purchased Bank of America securities during the Class Period.

### B.   THE DEFENDANTS

13.     Defendant Bank of America Corporation (NYSE: BAC) is a Delaware corporation headquartered in Charlotte, North Carolina.  BAC has transacted and continues to transact business in this District.  On July 1, 2008, BAC acquired Countrywide.  BAC is sued for its own misconduct and as a successor in interest to Countrywide.

14.     Defendant  Brian T. Moynihan has served as President, Chief Executive Officer, and a director of BAC since January 2010.

15.     Defendant Charles H. Noski has been BAC's Chief Financial Officer and Executive Vice President since May 2010.

16.     Defendant Kenneth D. Lewis served as BAC's Chief Executive Officer from 2001 until September 30, 2009.

17.     Defendant Joseph L. Price served as BAC's Chief Financial Officer from January 1, 2007 until February 1, 2010.

18.     Defendants Moynihan, Noski, Lewis, and Price are herein referred to as the "Individual Defendants."  During the Class Period, the Individual Defendants, by virtue of their senior executive positions at BAC, were privy to confidential and material information concerning BAC, its operations, finances, and practices related to its mortgage lending and servicing business.  The Individual Defendants also had access to materially adverse non-public

information concerning the Company's mortgage lending and servicing business, as discussed in detail below, through their access to confidential corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided directly to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly and indirectly, control the conduct of BAC's business and its market disclosures.

20.     The Individual Defendants, because of their high-ranking positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports, press releases, analyst meeting materials alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     As senior executives and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the

NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to BAC's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, including all material information relating to the Company's mortgage lending and servicing business. The Individual Defendants also had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of BAC's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of BAC's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts concerning BAC's mortgage lending and servicing operations. The scheme: (i) deceived the investing public regarding the quality and long-term profitability of the Company, and thus the intrinsic value of BAC securities; and (ii) caused Plaintiff and members of the Class to purchase BAC's common stock at artificially inflated prices, which declined dramatically when the truth was disclosed.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t-1, 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## FACTUAL BACKGROUND

### A.     BAC AND THE COUNTRYWIDE ACQUISITION

27.     BAC is a Delaware corporation with headquarters in Charlotte, North Carolina and offices throughout the United States.  The Company is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset management, and other financial and risk management products and services.

28.     On July 1, 2008, BAC acquired Countrywide in a $4.1 billion deal whereby Countrywide shareholders received 0.1822 shares of BAC stock for each share of Countrywide stock.

29.     At the time BAC acquired Countrywide, Countrywide was the largest mortgage lender and servicer in the United States.  Through its Mortgage Banking segment, Countrywide originated, purchased, sold, and serviced non-commercial, residential mortgage loans nationwide.  Typically, this segment accounted for around half of Countrywide's pre-tax earnings.  For instance, towards the height of the housing boom in 2006, $2.06 billion of Countrywide's $4.3 billion in pre-tax earnings came from Mortgage Banking.

30.     By contrast, BAC was only a modest player in the mortgage industry before acquiring Countrywide. After acquiring Countrywide, BAC's mortgage portfolio more than tripled in size, growing from four million to over 14 million residential mortgage loans.

**B.     BAC'S FRAUD ON ITS SHAREHOLDERS**

31.     As has been widely reported now, both Countrywide's origination and servicing practices ranged from utterly deficient to outright fraudulent.

32.     Countrywide's origination practices suffered from several flaws. First, Countrywide adopted a "matching" strategy whereby it matched any mortgage product feature offered by a competitor. Countrywide matched features even where it was imprudent to do so, resulting in riskier loans. Second, Countrywide ignored or doctored borrower's reported income, assets, and employment status in order to qualify these borrowers for mortgage loans. In many instances, Countrywide did not even require documentation from borrowers verifying their income or assets. Third, Countrywide approved loans based on fraudulent assessments of the borrower's ability to repay the loan. For example, Countrywide often calculated a borrower's ability to repay a loan based on the loan's introductory "teaser" interest rate without ever considering the borrower's ability to pay the higher interest rate once the teaser rate expired. Finally, Countrywide authorized, and even encouraged, employees to liberally make exceptions to Countrywide's underwriting standards if, despite all of the above, a borrower failed to qualify for a loan.

33.     After originating these loans, Countrywide either retained the loans on its own books, or sold the loans to other entities or persons, in the form of portfolios of whole loans or as pools of loans to be securitized into mortgage-backed securities. Even where Countrywide did not retain the loans but sold the loans to other investors, Countrywide remained on the hook for the loans through representations and warranties it agreed to when selling the loans. Typically,

under the sale agreements for the mortgage loans, Countrywide is required to repurchase any mortgage loans which there is a breach of Countrywide's representations and warranties, and which breaches are incurable.

34.    Soon after BAC closed on its acquisition of Countrywide, BAC realized the extent of its financial exposure as a result of Countrywide's faulty origination practices. Throughout the latter half of 2008 and 2009, BAC began to receive billions of dollars worth of repurchase requests from those to whom it had sold faulty loans, such as investors, insurers, and government-sponsored entities like Fannie Mae and Freddie Mac.  According to a report by Branch Hill Capital, BAC could face as much as $74 billion in repurchase requests, which could cut the Company's share price in half.  *See* "Mortgage Repurchases: Bank of America's Hidden Liability," Manal Mehta, Branch Hill Capital (August 2010).

35.    Whether or not Countrywide retained or sold the mortgage loans in question, Countrywide also serviced the vast majority of them.  Like its origination practices, however, Countrywide's servicing practices were seriously flawed.  A servicers' primary responsibility is to collect mortgage payments from borrowers and to remit those payments to the loan owner.  In order to have a right to payments, or to foreclose on a property where a borrower fails to make payments, the owner of a mortgage loan must, among other things, possess the promissory note or mortgage note showing that the borrower is responsible for the mortgage debt.  In many instances, Countrywide, as the originator of the loans, never transferred the promissory note to the purchaser of the loan, or lost the note outright.  Countrywide also lost or misplaced essential paperwork and loan documentation associated with the mortgages it serviced.  Additionally, Countrywide failed to properly record many of the loans it originated, instead delegating that task to a company called Mortgage Electronic Registry Systems, Inc. ("MERS"), an electronic

registry created by the mortgage banking industry to track transfers in servicing rights and beneficial ownership of millions of mortgage loans around the nation. Compounding the problems of missing paperwork and improper mortgage recordings, for more than a year after it acquired Countrywide, BAC used two servicing systems (its own and one inherited from Countrywide) that did not communicate with one another.  Rather than address these issues (or disclose them to investors), BAC adopted Countrywide's practices wholesale.

36.     Missing documents soon became a critical issue for BAC when many of Countrywide's mortgage loans entered foreclosure.  By the end of 2009, BAC owned over $20 billion in non-performing loans, resulting in tens of thousands of foreclosures.   Borrowers around the country began to contest foreclosure proceedings commenced by Countrywide, arguing that Countrywide engaged in faulty procedures and or could not produce vital, missing documents.  As a result, BAC realized that it had enormous financial exposure due to its faulty servicing of loans.

37.     Rather than confront this looming crisis by coming clean with its shareholders, BAC covered up the documentation and recording issues inherited from Countrywide by employing "robo-signers," low-level employees whose sole responsibility was to sign affidavits (often fraudulently) to be submitted in foreclosure proceedings, under which the robo-signers attested to having reviewed all of the documentation related to the mortgage, verified that BAC owned the mortgage note of the property being foreclosed, and affirmed that BAC had the right to foreclose the property.  Often these robo-signers never saw any documents related to the loans and had no idea whether BAC or some other person or entity owned the mortgage note.  Some did not even understand the most elementary aspects of the mortgage or foreclosure process.  For instance, according to an October 13, 2010 msnbc.com article, a "foreclosure supervisor" with

another bank testified that she could not "define basic terms like promissory note, mortgagee, lien, receiver, jurisdiction, circuit court, plaintiff's assignor, or defendant." "'Robo-signers' add to foreclosure fraud mess," http://www.msnbc.msn.com/id/39641329/ns/business-real_estate/ (last visited on March 17, 2011).  She also did not know "the required conditions [] for a bank to foreclose or who the holder of the mortgage note was." *Id.*

### C.   BAC MISLEADS INVESTORS WITH FALSE AND MISLEADING STATEMENTS ABOUT ITS FINANCIAL EXPOSURE TO LOAN REPURCHASE DEMANDS AND TO FAULTY SERVICING OPERATIONS

38.     Throughout the Class Period, BAC concealed from its shareholders, and issued false and misleading statements concerning, the extent of BAC's financial exposure to: (a) mortgage loan repurchase demands submitted by investors arguing that Countrywide had breached various representations and warranties concerning the mortgage loans originated by Countrywide and then sold to those investors; and (b) faulty servicing and foreclosure operations.

39.     In an August 3, 2009 press release announcing management changes at BAC, Defendant Lewis made false and misleading statements regarding the Company's then current and future business prospects.  For instance, Lewis stated that the Company had "greatly enhanced its position as the leading consumer bank in the world," and that BAC had "all the pieces of the puzzle in place to be the leading financial services firm in the world."  BAC August 3, 2009 Press Release.

40.     In a September 30, 2009 press release announcing Defendant Lewis' retirement, Defendant Lewis made false and misleading statements concerning the Countrywide acquisition and the Company's business prospects.  For example, Lewis stated that BAC "is well positioned to meet the continuing challenges of the economy and markets."  BAC September 30, 2009 Press

Release.  Lewis also claimed that the "Countrywide acquisition[] [was] on track and returning value already."  *Id.*

41.    In an October 16, 2009 press release announcing the Company's third-quarter 2009 earnings, the Company made false and misleading statements regarding the sufficiency of its reserves for loan losses.  Specifically, the Company stated that it "strengthened its reserves, capital position, and liquidity through efficient balance sheet and capital management."  BAC October 16, 2009 Press Release.  Defendant Lewis reaffirmed these false and misleading statements about the Company's reserves in a conference call that same day to discuss the Company's quarterly earnings.  Defendant Lewis claimed that the Company had a "continued high level of provision expense" and that it "substantially add[ed] to reserve levels."  BAC October 16, 2009 Earnings Call Transcript.

42.    In a January 20, 2010 conference call to discuss the Company's fourth-quarter 2009 earnings, Defendants continued to make false and misleading statements about their loan loss reserves and the impact of representations and warranties in loan purchase agreements to which the Company was party.  For instance, Defendant Price responded to a question about whether the Company was "well-enough reserved" for mortgage loan losses stemming from Countrywide's loan portfolio by saying, "Look, I think the way to think about it is Countrywide had a reserve.  We adjusted that in purchase accounting, we have been adding to it quarterly or dealing with it quarterly with the expenses each quarter since then and we will continue to manage it that way. . . . [W]e feel pretty good about where we stand."  BAC January 20, 2010 Earnings Call Transcript.  Regarding the representations and warranties in the Company's loan purchase agreements and whether the Company accounted for possible breaches of those warranties in its loss reserves, Defendant Price stated that he believed them to be "somewhat

unenforceable" and advised the analyst who asked about them that he "wouldn't put that one on your radar screen." *Id.*

43.     In a July 16, 2010 conference call to discuss the Company's second-quarter earnings, Defendant Moynihan falsely and misleadingly described the Company's operations related to foreclosures and mortgage loan modifications.  Specifically, Moynihan claimed that BAC was "devoting a ton of effort and expense to working through the defaults, short sales and modifications and we're attempting to help every customer we can.  In spite of all that hard work, we'll continue to see alleviated foreclosures, short sales and other liquidations for the next several quarters as we clean up the legacy Countrywide portfolio."  BAC July 16, 2010 Earnings Call Transcript.

### D.     THE TRUTH IS FINALLY REVEALED

44.     As a result of Defendants' omissions and misrepresentations of material fact described above, throughout the Class Period, BAC's shareholders remained under the illusion that BAC was, as it claimed, engaged in "responsible lending practices" and "attempting to help the customer in every way" they could.  In addition, BAC's shareholders were misled into believing that BAC's exposure to mortgage loans repurchase demands was limited and manageable.

45.     In September 2010, however, reports began to emerge concerning improprieties in the way that the nation's largest mortgage lenders, including BAC, were foreclosing properties. In particular, news agencies began reporting on the "robo-signers" BAC worked so hard to conceal.

46.     In response to the outcry over these reports, several banks suspended foreclosures. On September 20, 2010, GMAC Mortgage's Ally Financial Inc. suspended foreclosures in the 23 states where courts adjudicate foreclosures pending a review of GMAC's foreclosure policies.

On September 29, 2010, JP Morgan Chase announced that it too was suspending foreclosures in the same 23 states.

47.     Government agencies and personnel throughout the United States announced investigations into the foreclosure practices of large banks.   On September 24, 2010, the Attorneys General of Iowa and North Carolina announced that they were beginning separate investigations into GMAC's foreclosure practices.   The Attorney General of California then ordered GMAC to suspend all foreclosures in California.   Senator Al Franken of Minnesota asked government regulators to collaborate on a "thorough investigation into the alleged misconduct."   On September 30, 2010, the United States Treasury Department launched an investigation into foreclosure practices nationwide.

48.     Under immense government and public pressure, BAC reluctantly announced on October 1, 2010 that it too would suspend foreclosures in 23 states while it reviewed its foreclosure practices.   On October 8, 2010, BAC announced that it was extending the foreclosure suspension to all 50 states.   However, Defendant Moynihan steadfastly denied any wrongdoing on BAC's part, noting that it only suspended foreclosures to "clear the air."

49.     On October 13, 2010, the Attorneys Generals of all 50 states announced that they would investigate the underwriting guidelines, reserve policies, and foreclosure practices of the nation's major banks.   In response to bank executives, such as Defendant Moynihan, downplaying these issues, the Ohio Attorney General Richard Cordray cautioned, "I think the mortgage-servicing firms need to understand that they face real exposure now, and they would be well advised to take this very seriously, to clear this up by doing loan workouts to keep people in their homes, which up til now they've just paid lip-service to."

50.    On October 19, 2010, the SEC announced its own investigation into these issues. That same day, BAC finally revealed the truth to the market by admitting there were "technical issues" with its servicing and foreclosure practices.

51.    The revelation of BAC's improper servicing and foreclosure procedures, and the halt to foreclosure proceedings, has major financial ramifications for BAC.  For BAC and the other affected banks, the need to halt foreclosures has imposed the direct cost of limiting the banks' ability to seek redress where borrowers are seriously delinquent and has caused significant reputational harm to the banks.  On a broader scale, "[d]efaulters living in their homes are getting a subsidy worth about $2.6 billion a month, according to a Wall Street Journal analysis based on mortgage data from LPS Applied Analytics and rent data from the Commerce Department.  That's 0.25% of U.S. personal income, roughly equivalent to the benefit top earners receive from Bush-era tax breaks."  Mark Whitehouse, *The Stealth Stimulus Of Defaulters Living For Free*, The Wall Street Journal, Nov. 1, 2010, A2

52.    Furthermore, the truth began to emerge that the Company's exposure to anticipated demands from investors to buy back bad mortgages far exceeded the Company's reserves of over $4 billion.  On October 18, 2010, a group of investors, including the Federal Reserve Bank of New York, demanded that BAC also repurchase $47 billion worth of Countrywide-issued residential mortgage backed securities.  On October 19, 2010, the Company revealed that total buyback demands for mortgages (not including mortgage-backed securities) rose $20 billion with another $7 billion of buyback requests anticipated.  These investors premised their demand on BAC having breached certain foreclosure-related representations and warranties in their loan purchase agreements.

## DEFENDANTS ACTED WITH SCIENTER

53.     The following facts demonstrated that Defendants acted with scienter, had a motive, and intended to deceive Plaintiff and other investors about the Company's mortgage lending and servicing practices.

54.     By acquiring Countrywide, Defendants knew the extent of Countrywide's faulty mortgage origination practices.  Defendants were further apprised of the extent of the mortgage origination problems once BAC began to defend mortgage loan repurchase demands submitted by purchasers of mortgage loans.

55.     Defendants also knew that BAC's servicing and foreclosure practices were deficient and/or fraudulent, and knowingly mislead investors to the contrary.

56.     The Individual Defendants were all aware of these practices as residential mortgage lending and servicing constituted a significant part of the Company's overall business and as evidenced by their public statements.

57.     A positive market perception of these practices was necessary to ensure the Company's stock price remained inflated.

58.     Defendants were motivated further by the pressures on the stock prices of financial institutions during the recession.  Because the Company's stock price had already suffered during the recession and turnover was occurring within the executive ranks as a result, the Individual Defendants were highly incentivized to conceal the truth about the Company's mortgage lending and servicing practices.

## LOSS CAUSATION

59.     As a direct and proximate result of Defendants' wrongful conduct, as alleged herein, Plaintiff and the putative Class suffered substantial damages.

60.     During the Class Period, Plaintiff and the putative Class purchased BAC securities at artificially inflated prices and were damaged when the price of BAC securities declined after the truth was revealed, and/or the information alleged herein to have been concealed from the market was revealed, causing investors' losses.

61.     Specifically, BAC's stock declined sharply on October 13, 2010 when the Attorneys Generals of all 50 states announced their investigation into bank lending and servicing practices.  While the overall market remained flat, BAC's stock dropped 5%.  On October 14, 2010, when the Branch Hill Capital report analyzing BAC's liability for buyback claims emerged, BAC's stock price dropped another 4.92%.  On October 18, 2010, when a group of investors made $47 billion in buyback demands related to mortgage-backed securities sold by BAC, the Company's stock dropped 4.38%.  In total, BAC stock dropped 11.2% over 5 trading days between October 13, 2010 and October 19, 2010, falling $1.49 per share and wiping out over ***$15 billion*** in market capitalization.

62.     Throughout the Class Period, the Defendants' false and misleading statements and omissions concerning the Company's mortgage lending and servicing business inflated BAC's stock price.  Had the Defendants revealed the truth instead of concealing this material, negative information, Plaintiff and the putative Class would not have purchased BAC securities, or would not have purchased them at the artificially inflated prices at which they were offered.

63.     As a direct results of the Defendants' misrepresentations and concealment of material facts, the price of BAC common stock was artificially inflated throughout the Class Period.  Because of Defendants' misstatements and omissions, BAC common stock reached a Class Period high of $19.48.

64.     In total, from its Class Period high of $19.48 per share on April 15, 2010, BAC's share price declined over $7.68 per share, or over 39%.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired BAC publicly traded securities during the Class Period of July 23, 2009 through and including October 19, 2010 (the "Class").   Excluded from the Class are (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director or controlling person of BAC (including any of their subsidiaries or affiliates) or any other Defendant; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representative, heirs, successors, and assigns of any such excluded party.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. BAC had approximately 10 billion shares of common stock outstanding, owned by thousands of persons, with average daily trading volume of tens of millions of shares during the Class Period.

67.     There is a well-defined commonality in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(i)     whether the 1934 Act was violated by Defendants;

(ii)    whether Defendants omitted and/or misrepresented material facts;

(iii)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv)   whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(v)   whether the prices of BAC's publicly traded securities were artificially inflated; and

(vi)   the extent of damage sustained by Class members and the appropriate measure of damages.

68.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

69.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

70.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE**

71.   At all relevant times, the market for BAC common stock was an efficient market that promptly digested current information with respect to BAC from publicly available sources and reflected such information in the prices of BAC's shares, for the following reasons, among others:

(i)   BAC common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(ii)    As a regulated issuer, BAC filed periodic public reports with the SEC and the NYSE relating to its common stock;

(iii)    BAC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    BAC was followed by dozens of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

72.    As a result of the foregoing, the market for BAC common stock promptly digested current information regarding BAC from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of BAC common stock suffered similar injury by trading in BAC common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

73.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BAC who knew that those statements were false when made.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.  Defendants herein are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

77.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of BAC, as specified herein.  In particular, Defendants engaged and participated in a continuous course of conduct to conceal adverse material information regarding the Company's mortgage lending and servicing practices.

78.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct involving false and misleading statements, as specified herein, to mislead and defraud analysts, investors, and the public.   In particular, Defendants made numerous affirmative misrepresentations during the Class Period, as specified above.

79.    The allegations set forth above establish a strong inference that the Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness for the purpose and effect of concealing BAC's present and future business prospects from the investing public and supporting the artificially inflated price of BAC's securities.

80.    As a result of the Defendants' dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, the Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BAC common stock.  Plaintiffs and the Class would not have purchased BAC common stock at the prices they paid, would have paid less, or would not have purchased BAC common stock at all, if they had been aware that the market prices had been

artificially and falsely inflated by Defendants' fraudulent scheme,  misleading statements and material omissions.

81.     At the time of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, the Plaintiffs and the Class were ignorant of the falsity of the statements and were ignorant of the omissions.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered economic damages in connection with their purchases of BAC common stock during the Class Period when the truth was disclosed, causing the value of BAC's stock to decline dramatically.

**COUNT II**
**Violation Of Section 20(a) Of The Exchange Act**
**(Against The Individual Defendants )**

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     During the Class Period, the Individual Defendants, by virtue of their senior executive positions in BAC, were privy to confidential and proprietary information concerning BAC, its operations, finances, financial condition and present and future business prospects relating to the Company's mortgage lending and servicing operations.   The Individual Defendants also had access to materially adverse non-public information concerning these operations.  Because of their positions within BAC, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

85.    The Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of BAC's business and its market disclosures.

86.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports, press releases, advertisements and marketing materials alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

87.    As senior executives and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to BAC's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of BAC's common stock would be based upon truthful and accurate information.   The Individual

Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

88.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of BAC's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts concerning the Company's mortgage lending and servicing operations.  This scheme: (i) deceived the investing public regarding the quality and long-term profitability of the Company's mortgage lending and servicing business and thus the intrinsic value of BAC securities; and (ii) caused Plaintiff and members of the Class to purchase BAC's common stock at artificially inflated prices, which declined dramatically when the truth was disclosed.

89.     As set forth above, the Individual Defendants and BAC each violated Section 10(b) and Rule 10b-5 by their acts and omissions.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

90.     As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment in its favor, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel.

B.      Awarding damages to Plaintiff and the Class pursuant to Section 10(b) of the Securities Exchange Act against all Defendants, jointly and severally, in an amount to be proven at trial;

C.      Awarding damages to Plaintiff and the Class pursuant to Section 20(a) of the Securities Exchange Act against the Individual Defendants;

D.      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts;

E.      Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiff and the Class; and

F.      Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

Dated:        March 25, 2011                    Respectfully submitted,

**CRIDEN & LOVE, P.A.**                         **LAW OFFICE OF CARMEN GIORDANO**
Michael E. Criden
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143                      Carmen S. Giordano
Telephone:    (305) 357-9000                    226 Lenox Avenue
Facsimile:    (305) 357-9050                    New York, New York 10027
                                                Telephone:    (212) 406-9466
                                                Facsimile:    (212) 406-9410
*Of Counsel for Plaintiff Patricia Grossberg*
*Living Trust*
                                                *Attorney for Plaintiff Patricia Grossberg*
                                                *Living Trust*

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2011 the attached Amended Complaint was filed with the

Court. A copy of this filing was served via email to the following party:


Scott D. Musoff, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036

*Counsel for Defendants Bank Of America
Corporation, Brian T. Moynihan, Charles H.
Noski, Kenneth D. Lewis, Joseph L. Price,
and Countrywide Financial Corporation,*



Carmen S. Giordano